UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 00-11733-RWZ

SANG VO, *et al.*

v.

CITY OF BOSTON, *et al.*

MEMORANDUM OF DECISION AND ORDER

September 22, 2003

ZOBEL, D.J.

Plaintiffs Sang Vo, Khai Vo, Hoa Tran, Oanh Xuan Vu, and Phuoc Tran are members of three Vietnamese immigrant families – the Sang family, the Oanh family, and the Phuoc family[1] – who are facing eviction from their apartments in the Dorchester section of Boston, Massachusetts. Each family is a tenant in an apartment owned by defendant Chanh Ly ("Chanh") and is solely responsible for paying the monthly rent. Plaintiffs have tenant-at-will arrangements with Chanh and have lived in the apartments for between five and ten years. Each apartment has four bedrooms, and plaintiffs have always shared their living space with other recent Vietnamese immigrants.[2] Those additional occupants pay their portion of the rent to the plaintiff families, not Chanh.

———————————————

[1] The Sang family is comprised of plaintiff Sang Vo, his wife, and their son, plaintiff Khai Vo. The Oanh family is comprised of plaintiff Hoa Tran, her husband, plaintiff Oanh Xuan Vu, and their four children. And the Phuoc family is comprised of plaintiff Phuoc Tran, his wife, and their two sons.

[2] According to plaintiffs, shared living arrangements are common in Vietnam and among Vietnamese immigrants locally.

On February 16, 2000, agents of defendant Inspectional Services Division ("ISD"),

the city agency responsible for enforcing the Massachusetts State Building and Sanitary

Codes and the Boston Zoning Code, conducted surprise inspections of the apartments.

At the time, the Sang family shared its apartment with a family of three plus one other

individual.  The Phuoc family also shared its apartment with a family of three and another

individual.  The Oanh family lived with between two and four other people, including a

cousin who did not pay rent.[3]  Defendant landlord Chanh and his attorney accompanied

ISD on the searches.  Although the inspection team numbered nine individuals,[4] no one

was able to speak Vietnamese.  Apparently, none of the plaintiffs or any of those resident

in the apartments speaks English, and all present relied on Chanh to translate.  Members

of the three plaintiff families signed consent forms, although plaintiffs allege that the forms

were never translated into Vietnamese and were provided and signed only after the

searches were completed.  ISD videotaped some portion of the inspections.  ISD claims

only one apartment was videotaped – and only for four minutes – but plaintiffs' affidavits

allege that the videotaping was more extensive.

In addition to enforcing the Building, Sanitary, and Zoning Codes, ISD serves as the

agent of defendant Boston Licensing Board ("Board"), the state agency responsible for

---

[3] Although Hoa Tran has signed an affidavit that her family lived with only two other people, her deposition testimony suggests that two additional people also shared the Oanh family apartment at the time of the inspection.  The record remains unclear on this point.  According to all plaintiffs, no more than three individuals have lived with each family since the inspections.

[4] This number includes one representative of the fire department who accompanied the ISD team.

implementing within the City of Boston the Massachusetts Lodging House Statute

("Lodging House Statute" or "statute"), codified at Mass. Gen. L. ch. 140, §§ 22-32.[5]  The

statute requires a license for the operation of a "lodging house," which is defined as a

"house where lodgings are let to four or more persons not within second degree of kindred

from the person conducting it . . . ."  Id., § 22.[6]  Whenever ISD determines that a property is

an unlicensed lodging house, it files a complaint with the Licensing Board.  The Board's

chairman then reviews the complaint and determines whether or not to hold a hearing.  If a

hearing is scheduled, notice is sent to the property's record owner, referring to the statute

and the alleged violation and informing the owner of the right to be represented by counsel

at the hearing.  The Board then conducts a public hearing to determine whether the

property is in fact being operated as a lodging house.  Upon a finding of a violation, the

Board typically enjoins the owner from running an illegal lodging house or defers enjoining

the owner for a short period of time to allow him or

her to come into compliance.[7]

_____

[5] According to the deposition testimony of Kathleen P. McNally, the Licensing Board's executive secretary and general counsel, the Board "came to an agreement with Commissioner Joyce in Inspectional Services . . . that his inspectors would inspect in their normal course of inspections, their normal duties, and if they came across premises that were being operated, they would file a report . . . to our Board.  We would hold the hearing and enjoin the operation of such."

[6] The keeper of an unlicensed lodging house may face fines and a maximum of three months' imprisonment.  Mass. Gen. Laws ch. 140, § 24.  The Lodging House Statute also requires that licensed lodging houses be subject to inspection by "the licensing authorities and their authorized agents, and by the police on request from the licensing authorities."  Id., § 25.  A licensed lodging house keeper is subject to criminal penalties if he or she "knowingly permits the property under his control to be used for the purpose of immoral solicitation, immoral bargaining or immoral conduct . . . ."  Id., § 26.

[7] According to McNally, "[i]n other situations similar to this" the Board has requested "an inspector from ISD to go out and reinspect the property two months or three [] months

One day after the February 16 inspections, ISD sent letters to the Licensing Board that constituted formal complaints about plaintiffs' apartments.  The letters noted that inspectors found numerous violations of the State Building and Sanitary Codes and "also determined that the building was being used as a lodging house without the required lodging house license issued by the Licensing Board . . . ."  ISD therefore requested that the Board "hold a public hearing and enjoin the use of this property as a lodging house."

Also on February 17, 2000, ISD sent notices of violation to defendant landlord Chanh.  The notices reported a finding that Chanh had failed to secure a permit to change the occupancy of his properties to a lodging house, in violation of the State Building Code, Mass. Regs. Code tit. 780, § 110.1.  To remedy the violation, ISD ordered Chanh to "[a]pply and secure a permit to change the occupancy . . . to: Lodging House or remove the illegal unit and restore the building to its legal occupancy."  The notices gave Chanh twenty-four hours to comply.

On February 18, 2000, Chanh's attorney wrote ISD to inform the agency that Chanh "is prepared to bring eviction actions to terminate the illegal rooming use by the tenants, but we are concerned about tenant displacement in this tight housing market.  Unless we hear otherwise from your office, Mr. [Chanh] Ly will begin evictions and cite the reason for the evictions as the illegal use noted by your department."[8]  On

down the road."

[8] Chanh repeatedly testified at deposition that ISD and the Licensing Board told him the apartments were illegal lodging houses and forced him to initiate and prosecute eviction proceedings against plaintiffs.  At the hearing before the Licensing Board, Chanh's attorney emphasized Chanh's reluctance to evict plaintiffs: "Mr. Ly has begun eviction . . . because . . . he was informed by the building department that the tenants were

February 29, Chanh sent notices to terminate tenancy to "Phuoc Tran and all other occupants" of the Phuoc family apartment as well as to "Sang Vo and all other occupants" of the Sang family apartment.  The notices listed a number of causes for eviction: having "too many occupants in violation of the Boston Zoning Code," "keeping the apartment and stairways in a dirty and unsanitary condition," and "running an illegal rooming house" with padlocks installed on each bedroom.  Additionally, the notices said that "the landlord seeks to increase the rent and wants the apartment vacant."

On March 1, 2000, the Licensing Board sent Chanh notice to appear at a hearing to determine if he violated the statute by operating an unlicensed lodging house.  The hearing was held on March 28, 2000.  No notice was sent to plaintiffs, and they did not attend.  At the hearing, although no one explained the Licensing Board's interpretation of the Lodging House Statute, Licensing Board Chairman Daniel F. Pokaski said, "What we're dealing with purely is, is how many people are living in Mr. [Chanh] Ly's third floor and are they related; who lives there and are they being used as a lodging house illegally."  An ISD inspector described that "quite a few of the doors" in the apartments at issue were padlocked and that there were "hot plates in each room[,] [o]ne bathroom[,] [b]eds in almost every room in the house except for a kitchen, a common kitchen, looked like a common area, a common bathroom."  But the inspector was not prepared to testify fully about conditions in the three apartments, explaining, "I don't have my notes, to tell you the truth right off the bat."  When Chairman Pokaski asked the inspector if "there was more

---

using the building in an illegal manner . . . . I want to make a distinction between the landlord knowingly permitting this and gaining financial remuneration from running a lodging house . . . . He's charging for a normal apartment.  And the problem is once you start evictions . . . , you're evicting poor tenants who will have no place to go.  It's a horrible economy.  There are no apartments available."

than three people living" in the apartments, the inspector said yes.  But when asked how many unrelated people lived in each unit, he replied that he "couldn't determine that."

Chanh appeared with counsel and informed the Board that he neither ran a lodging house nor wanted a license.  His attorney explained that Chanh would pursue eviction against one apartment, and if the Housing Court "supports your program and says he can ask that tenant to leave, he will ask that tenant to leave.  He will then proceed to the next apartment and the next apartment."  Chairman Pokaski urged Chanh to "go ahead and serve this on the other problems [sic] also that you feel are being occupied illegally.  Get the process started. . . . As long as you show a good faith effort to correct the problem, we're not going to jump down your throat."  Three days later, the Licensing Board issued a notice to Chanh, stating "The following action was taken by the Board.  Defer for 2 months, owner will file eviction notices."

In April 2000, Chanh filed eviction complaints in Housing Court against all occupants of the Sang and Phuoc family apartments.  The following month, ISD sued Chanh in Housing Court "to permanently enjoin [him] from continuing to maintain the premises . . . in an unsanitary and unsafe condition in violation of the state sanitary and building codes."  On May 31, Chanh sent "Oanh Xuan Vu and all other occupants" of the Oanh family apartment a notice to terminate tenancy, listing two reasons: "You are using your apartment as a rooming house in violation of the Boston Zoning Code.  The landlord wants to increase the rent and is terminating your tenancy.  The rental value of your apartment is more then [sic] $1,200.00."  Shortly thereafter, Chanh filed an eviction complaint against all occupants of the Oanh family apartment.

7

On August 28, 2000, plaintiffs sued the Licensing Board and its chairman, ISD and its commissioner, and their landlord for damages and declaratory and injunctive relief.  The Second Amended Complaint alleges nine causes of action, designated as "claims."  The first two call into question the applicability of the Lodging House Statute to plaintiffs and the landlord.  Plaintiffs contend that "defendant government officials" acted arbitrarily and capriciously by compelling Chanh to evict plaintiffs or obtain a lodging house license.  The third claim states that "the defendants" violated the equal protection and due process clauses of the United States Constitution and the Massachusetts Declaration of Rights by subjecting plaintiffs to eviction for living with people unrelated to them.  The fourth and fifth claims allege that ISD violated plaintiffs' procedural due process and privacy rights "by conducting unauthorized searches of Plaintiffs' apartments and engaging in coercive videotaping and interrogations . . . ."  The fourth claim also alleges a procedural due process violation by the Licensing Board for "determining that Plaintiffs must be evicted . . . without providing Plaintiffs with notice and an opportunity to be heard . . . ."  Claim 6 challenges as void for vagueness the Massachusetts definition of "lodging house" in Mass. Gen. L. ch. 140, § 22.  The seventh and eighth claims allege fair housing violations, which plaintiffs are not pursuing; those claims are hereby dismissed with prejudice.  The ninth claim seeks redress only against the landlord Chanh and is the only claim against him.  Here plaintiffs say that he initiated eviction proceedings in order to retaliate against them for cooperating with ISD in identifying substandard conditions at their apartments.

All parties except the landlord have moved for summary judgment.  Although plaintiffs do not distinguish between the Licensing Board and ISD, aggregating them in the

claims as "government defendants," the two agencies filed separate and distinct motions.

The Licensing Board moves for summary judgment on claims 1, 2, 3, 4, and 6, and ISD

seeks partial summary judgment with respect to claims 3 through 6.  Plaintiffs request

partial summary judgment as to claims 1, 2, 3, and 4.

Discussion

I. <u>Standing</u>

The Licensing Board bases much of its motion for summary judgment on the

contention that plaintiffs lack standing to sue.  To establish standing, plaintiffs must show

(1) that they suffered an "injury in fact" that is (2) "fairly traceable to the challenged action of

the defendant" and (3) that is likely to be redressed by a favorable decision in this case.

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).  Plaintiffs bear the burden of

proof in establishing that they have standing and at the summary judgment stage must "set

forth by affidavit or other evidence specific facts . . . which for purposes of the summary

judgment motion will be taken to be true."  <u>Id.</u> at 561 (internal citation and quotation marks

omitted).  The Board argues that plaintiffs cannot satisfy the second and third prongs of

<u>Lujan</u>.

Regarding the second prong, the Board contends that there is no injury traceable to

it because technically it declined to take any enforcement action in this case; rather, its only

official action with respect to plaintiffs' apartments was to "defer for 2 months, owner will

file eviction notices."  The Board's argument is not supported by the record.  Plaintiffs have

provided specific evidence to show that the Board's deferral of action in fact constituted a

finding that plaintiffs' apartments were being operated as lodging houses in violation of

10

Massachusetts law – defendant landlord Chanh had two months to start evicting his tenants or else he would face enforcement action.  The Board's executive secretary and general counsel, Kathleen P. McNally, admitted as much in deposition testimony.  After McNally said that the Board "didn't enjoin them from operating an illegal lodging house.  They deferred it," plaintiff's counsel asked, "Does this mean the Board made a determination that the [sic] was, in fact, an illegal lodging house being operated?"  McNally responded, "It means the Board voted to defer for two months to give the owner time to come into compliance, so implied in that, yes."  The transcript of the March 28, 2000, hearing supports McNally's admission.  The Board's Chairman, defendant Pokaski, instructed Chanh to "[g]et the [eviction] process started. . . . As long as you show a good faith effort to correct the problem, we're not going to jump down your throat."

The Board further argues that there is no injury "fairly traceable" to it because Chanh could have renegotiated the terms of his leases with plaintiffs to limit the number of occupants, as he did with another of his tenants prior to the March 28 hearing.  But the Board was informed at the hearing that Chanh's compliance with the Lodging House Statute would take the form of evicting plaintiffs.  The Board discussed the eviction process with Chanh, and Chairman Pokaski urged him to start eviction proceedings as to all plaintiffs.  The notice of the action taken by the Board after the hearing specifically mentions that "owner will file eviction notices."  After the hearing, Chanh sued the plaintiffs in Housing Court.  He has testified that he felt compelled by the Board and ISD to evict them.   Plaintiffs have made an adequate showing that the Board gave Chanh little choice but to evict plaintiffs, so plaintiffs' injuries are "fairly traceable" to it.

Regarding the third prong of Lujan, the Board argues that plaintiffs cannot prove

their injuries will be redressed by a favorable decision in this case because Chanh has given multiple grounds for eviction.  This argument fails.  Taken as true, plaintiffs' evidence shows that Chanh initiated and pursued eviction proceedings because of the pressure he received from the Board and ISD, which was acting as the Board's agent.  Failure to evict plaintiffs would expose Chanh to civil and criminal penalties under the Lodging House Statute; the Board would, in its chairman's words, "jump down [his] throat."  If the Board exercised its "powerful coercive effect" on Chanh in excess of its authority and pressured him to evict plaintiffs without a legitimate basis to do so, <u>Bennett v. Spear</u>, 520 U.S. at 169, then plaintiffs suffered injuries that are redressable by the relief sought in this action – even if Chanh could evict them also on other grounds.

Moreover, plaintiffs are contesting every ground for eviction in Housing Court, and their claims against the Board are an essential part of this defense.  Their standing to sue cannot be short-circuited by the existence of more than one enumerated basis for eviction. If, for example, eviction was predicated on two bases – a violation of one statute as determined by the Board and a finding of illegality under another statute by, say, the Fire Department – plaintiffs would undoubtedly have standing to sue both agencies if the statutes were unconstitutional or that the determinations violated due process and equal protection.  Otherwise, two wrongs would make a right: the agencies could make equally illegal decisions but would be immune from suit.  In the present case, the remedies plaintiffs seek against the Board will likely redress the claimed injuries to their due process, equal protection, and property rights.

In fact, two of the plaintiff families have entered into agreements with defendant landlord Chanh to remain in the apartments and continue sharing them with up to three

additional adult occupants.  Chanh and the Sang and Phuoc families have filed stipulations

of dismissal to the eviction actions in Housing Court with the understanding that the cases

can be reinstated if the defendant agencies pursue enforcement proceedings against the

landlord.  If this court decides in plaintiffs' favor, they will no longer face eviction

proceedings.  Redress will be complete.

Finally, the Complaint alleges that plaintiffs share their apartments with other

families so that they can afford to live in Boston.  Even if they are evicted on grounds other

than running an illegal lodging house, they will continue to confront the high cost of housing

in Boston and will likely come up against the Lodging House restrictions in the future.  The

declaratory and injunctive relief sought in the case will give them redress.  Plaintiffs have

standing to sue the Board.

II.  Whether Plaintiffs' Apartments Were Being Conducted as Lodging Houses

Three of plaintiffs' six claims hinge on the meaning of a "lodging house."  Claims 1

and 2 contend that none of the living arrangements at issue triggers the Lodging House

Statute's licensing requirement, and claim 6 alleges that the statutory definition of "lodging

house" is void for vagueness.  Both agency defendants move for summary judgment on

claim 6, and plaintiffs and the Licensing Board each seek summary judgment on claims 1

and 2 as well.  It is therefore necessary at the outset to construe Mass. Gen. Laws. ch. 140,

§ 22.

A.  The Definition of a Lodging House

The statutory definition of a lodging house contains three elements: (1) "a house

where lodgings are let" (2) "to four or more persons" (3) "not within the second degree of

13

kindred to the person conducting it." Mass. Gen. L. ch. 140, § 22. Each of the moving parties defines the provision differently. The Licensing Board interprets it to include any apartment that a landlord rents to four or more people who are unrelated to each other; according to the Board, the landlord is the only person who can conduct a lodging house. ISD construes the provision to mean that a landlord or a tenant could conduct a lodging house – a tenant family could take in a maximum of three additional boarders without becoming a lodging house. Plaintiffs agree with ISD that a tenant could conduct a lodging house but assert that the tenant's additional boarders must be unrelated to each other. Plaintiffs contend in addition that the susceptibility of the statute to three competing constructions shows that it is void for vagueness.

The Licensing Board's interpretation provides a useful starting point in making sense of the statute. According to the Board, a "lodging house" means (1) any place to live that (2) a landlord rents (3) to four or more people (4) unrelated to each other. The last element of the Board's interpretation immediately stands out because nowhere does the statute contain a requirement that the "four or more persons" who let lodgings be unrelated to *each other*. Rather, the statute only requires that the lodgers be unrelated to the person conducting the lodging house. But if, as the Licensing Board insists, "a house where lodgings are let" means any place to live and "the person conducting" the lodging house is always the landlord, the plain language of the statute would mean that any time a family of four rents an apartment, its owner must apply for a lodging house license. Therefore, the Board must read the additional kindred requirement into the statute to avoid an absurd result.

14

But the plain language does not compel a construction that assumes the statute omitted an essential element.  First, the landlord is not the only person who can run a lodging house.  If that were the case, the statute would have so specified.  Instead, it uses the broader phrase "person conducting it," which surely includes tenants.

Historically, tenants routinely conducted lodging houses.  The Lodging House Statute was initially passed in 1918 in substantially similar form to the present version.  Twelve years earlier, an Oberlin sociologist wrote a detailed study of Boston's South End, where tens of thousands of people lived in lodging houses.  See Albert Benedict Wolfe, The Lodging House Problem in Boston (1906).  In a chapter entitled "The Lodging-House Keeper and Her Problem," Wolfe identified most keepers as tenants, not owners; in fact, rent was their primary expense.  Id. at 58.[9]  Lodging houses were businesses within what often were once stately Boston homes,[10] and when a lodging house keeper "bought" a lodging house, she bought "not the building, but the furniture and good-will."  Id. at 63.  This notion that a tenant could conduct a lodging house is borne out by numerous cases across the country.  See, e.g., Deslandes v. Scales, 65 So. 393, 394 (Ala. 1914) ("[P]laintiffs . . . intended, when they leased the dwelling, which was large, to conduct a boarding house, and did, upon assuming possession, conduct a boarding house.  That was their

_____

[9] According to Wolfe,  "[t]he rent for a 10-, 11-, or 12-room house ranges from $600 to $800, with a probable average of $750.  The larger houses, of 16 to 18 rooms, rent for $1000 to $1500, the latter being a very exceptional rent in very favored locations."  Wolfe, supra, at 58.

[10] Wolfe notes that lodging houses were also run out of tenement apartments: "In Boston, this particular evil, while not so great, is still serious."  Wolfe, supra, at 5.

15

business."); <u>Budaef v. Huber</u>, 14 Cal. Rptr. 729, 731 (Cal. Dist. Ct. App. 1961) ("The

property was let for use as a rooming house," but the tenants conducting it had too few

customers to pay the rent on the building); <u>Tureman v. Ketterlin</u>, 263 S.W. 202, 203 (Mo.

1924) ("The Tureman house is a large two-story brick occupied by tenants, a retired

minister and his wife, who conduct a boarding house there."); <u>McCoy v. McGoldrick</u>, 103

N.E.2d 349, 349 (N.Y. 1951) ("The tenants occupied a two room basement as living

quarters and conducted a rooming house on the remaining floors."); <u>Grantham v. Gibson</u>,

83 P. 14, 15 (Wash. 1905) ("[A]ppellants and respondent are tenants in the same building;

. . . the respondent conducts a hotel and lodging house . . . . [T]he installation of . . . musical

instruments and the shooting gallery by the appellants has already driven away some 14 of

[respondent's] patrons . . . .").

Since both history and the law reveal that tenants often conducted lodging houses, it

is little surprise that ISD actually interprets the Lodging House Statute to include tenants

within the meaning of "persons conducting it."  According to a December 2001 ISD

Commissioner's Bulletin, the agency's interpretation of the Lodging House Statute

includes the following: "When a tenant under a lease or at will agrees to allow another

person or persons to reside in the dwelling unit occupied by the tenant in exchange for a

financial contribution toward the rent, utilities and/or household expense, the tenant and the

tenant's family shall be considered the person 'conducting it' for the purposes of M.G.L. c.

140, § 22."  <u>See also</u> Mass. Regs. Code tit. 830, § 62C.16.1 (Department of Revenue

regulations for room occupancy excise tax returns required of every lodging house

"operator," which is defined as "any person operating a . . . lodging house . . . , but not

limited to, the owner or proprietor of such premises, the lessee, sublessee, mortgagee in

possession, licensee or any other person otherwise operating such . . . lodging house . . . ."). ISD's interpretation of who may conduct a lodging house is entirely correct. The statutory language and every other indicator of actual practice and common sense plainly contemplate that lodging houses are not always conducted by landlords.

The Licensing Board is also compelled to insert the additional kindred requirement as a result of construing "a house where lodgings are let" to mean "any place to live in any house." Again, the plain language of the statute, numerous state regulations, the case law, and history suggest otherwise. "A house where lodgings are let" simply mirrors the dictionary definition of "lodging house." See, e.g., Webster's New Collegiate Dictionary 670 (1979) ("a house where lodgings are provided and let"); Oxford English Dictionary Online (2003) (from the second print edition, 1989) ("A house, other than an inn or hotel, in which lodgings are let."); see also Selvetti v. Building Inspector of Revere, 353 Mass. 645, 646 (1968) ("A dictionary definition of . . . 'lodging house' [is] 'a house in which lodgings are let, esp. a house other than an inn or hotel.'"). The definition, then, turns on the meaning of "lodgings." Although the Licensing Board defines "lodgings" broadly as "a place to live," the more common and precise definition is "a room in the house of another used as a place of residence." Webster's, supra, at 670. See also Webster's II New College Dictionary 644 (2001) ("[s]leeping accommodations" and "rented rooms"); Oxford English Dictionary Online, supra ("A room or rooms hired for accommodation and residence in the house of another . . . .").

The Licensing Board suggests that such a definition of "lodgings" includes an apartment in a building owned by another, but that is neither a sensible construction nor one that is supported by the weight of authority. An apartment leased by a tenant is not

merely a set of rooms in "the house of another"; tenants live in apartments as if they are the

tenants' own homes for the term of the lease.  "Lodgings," by contrast, means a room or

rooms rented in a house or apartment in which someone else is the primary occupant

and/or possessor of the property.  Long ago, the Supreme Judicial Court of

Massachusetts recognized this distinct concept of "lodgings":  "[A] mere lodger in the

house of another is not a tenant. . . . [A] man who let rooms to lodgers [is] still the sole

occupier of the house . . . ."  White v. Maynard, 111 Mass. 250, 253 (1872); see also id. at

255 ("In an "ordinary agreement for board and lodging in [a] boarding-house, . . . the . . .

keeper of the boarding-house[] retained the legal possession, custody and care of the

whole house and every room therein."); Hall v. Zoning Bd. of Appeals of Edgartown, 549

N.E.2d 433, 437 (Mass. App. Ct. 1990) (endorsing White v. Maynard).

This distinction between "lodgings" and "apartments" is supported by the

Massachusetts Code of Regulations.  Under the state's Sanitary Code, for example, a

"rooming house" – a designation that includes lodging houses – "contains . . . rooming

units in which space is let or sublet for compensation . . . to four or more persons not within

the second degree of kindred to the person compensated.."  Mass. Regs. Code tit. 105, §

410.020.  The Code proceeds to define "rooming unit" as a "room or group of rooms let to

an individual or household for use as living and sleeping quarters but not for cooking,

whether or not common facilities for cooking are made available."  Id.  By contrast, the

Code also defines something called a "dwelling unit":  a "room or group of rooms within a

dwelling used . . . by one family or household for living, sleeping, cooking and eating.

Dwelling unit shall also mean a condominium unit."  Separate standards are then

18

promulgated for dwelling units and rooming houses.  See, e.g., Mass. Regs. Code tit. 105,

§§ 410.100, 410.150, 410.550.  Id.  This regulatory scheme, which is repeated and

reinforced in other state regulations,[11] bolsters the plain meaning of the Lodging House

Statute: a rooming unit is not a dwelling unit, which is to say, an apartment is not

synonymous with "lodgings."

        The distinction between lodgings and apartments is also supported by history.

When the Lodging House Statute was first enacted, it was understood that lodging houses

were different from apartment houses.  Apartments were family houses "rented in suites

and . . . fitted for housekeeping."  Wolfe, supra, at 5.  Lodging houses, by contrast, were

not homes for families – they provided single sleeping accommodations, and lodgers ate

their meals elsewhere.  The two most common forms of lodging houses in Boston were

Bowery-style dormitories for poor transients and the rooming houses that sheltered the

city's "great army of mercantile employees and skilled mechanics – the clerks, salesmen,

bookkeepers, stenographers, dressmakers, milliners, barbers, restaurant-keepers,

policemen, nurses, and the unmarried journeymen carpenters, painters, machinists,

electricians, etc."  Id. at 5-6.  The Lodging House Statute was broadly worded enough to

encompass both types of accommodations.  Because the statute also plainly extended to

---

        [11] The State Fire Code defines a lodging house as a building "in which separate
sleeping rooms are rented providing sleeping accommodations for persons on either a
transient or a permanent basis."  An apartment house, by contrast, contains "six or more
dwelling units," which are defined as "single living unit[s] . . . providing complete
independent living facilities . . . including permanent provisions for living, sleeping,
cooking, and sanitation."  Mass. Regs. Code. tit. 527, § 24.03.  See also Mass Regs.
Code tit. 105, § 460.020 (lead poisoning regulations).

similar rooming arrangements such as nursing homes, see Maher v. Brookline, 158

N.E.2d 320, 324 (Mass. 1959), the statute was amended in 1960, 1965 and 1973 either to

include or exclude various living situations analogous to "lodgings."[12]  Nothing in those

amendments shows any legislative intention to extend the traditional notion of lodgings to

apartments.  The history of lodging houses in Boston and the legislative history of the

Lodging House Statute support the plain language distinction between lodgings and

apartments.

    The closest Massachusetts case that supports the Licensing Board's elimination of

the distinction between apartments and lodgings is the intermediate appellate decision in

City of Worcester v. Bonaventura, 775 N.E.2d 795 (Mass. App. Ct. 2002).  Bonaventura

considered a city zoning ordinance that contained a definition of "lodging house" similar to

that of Mass. Gen. L. ch. 140, § 22, along with a provision that defined "family" as "not

including a group of more than three (3) persons who are not within the second degree of

kinship."  The court held that "[t]aken together, a lodging house is clearly defined as a

dwelling unit that is rented to four or more persons not constituting a family."  Id. at 797.

The type of law at issue (a municipal zoning ordinance) and the presence of additional

language defining "family" are fundamentally distinguishable from the circumstances of the

present case.  Significantly, though, Bonaventura's holding hinged on its characterization

of White v. Maynard's distinction between a lodger and a tenant as having been

superceded by Mass. Gen. Laws ch. 186, § 17.  The statute provides that lodging house

_____

    [12] The 1973 amendments also changed the trigger for the licensing requirement
from five or more lodgers to four.

patrons gain tenant-at-will status after three months of residency.  While the measure does indeed grant lodging house residents broader rights, the most immediate entitlement being proper notice before eviction, it does not change what a lodging house resident rents – sleeping accommodations – or a resident's role and place within a lodging house. That limited role and place preceded and was reflected in the limited rights traditionally granted to a lodger under common law.  It does not follow that the lodger's role changed just because the legislature broadened those rights.  A lodger still lets a room in another's house, while a tenant in an apartment is king of his castle.

B.  <u>Whether the Lodging House Statute Is Void for Vagueness</u>

Because the Lodging House Statute's plain meaning is readily identifiable, plaintiffs cannot sustain their sixth claim, which alleges that the statute is incapable of being construed in any way that satisfies due process.  ISD and the Licensing Board seek summary judgment on this claim.  A statute is void for vagueness if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ."  <u>Connally v. General Const. Co.</u>, 269 U.S. 385, 391 (1926).  The Lodging House Statute is not void for vagueness – it simply is narrower than the construction given it by the Licensing Board.  A lodging house license is required whenever someone (for example, a landlord or a tenant) lets lodgings (sleeping accommodations) to four or more people not related to the person running the operation.  From the defendant agencies' perspective, the problem with the plain meaning – supported as it is by common sense, history, and the weight of authority – is that very few people live this way anymore.  The Lodging House Statute was enacted out

21

of concern that the masses of young and unmarried people powering Boston's economy, many from the country or overseas and without family connections, were leading lonely, antisocial, sexually loose, or otherwise unhealthy lives.  See, e.g., Newbury Junior College v. Town of Brookline, 472 N.E.2d 1373, 1378 (Mass. App. Ct. 1985) (noting that one legislative purpose behind the 1918 lodging house statute was to aid the war effort by curbing the spread of venereal disease).  The regulations were undoubtedly important at the time because one century ago, an enormous percentage of the Boston population lived in places that identified themselves or were immediately recognizable as lodging houses.

Not so anymore.  A quick glance through the Boston Globe real estate classifieds or the notices posted on Craig's List suffices to confirm that the residents of Boston by and large do not take "lodgings" when they move to the city.  They rent apartments and are often compelled by the city's high rents to share them.  In some cases, roommates may function as a family unit, and in others, they may lead entirely independent lives.  In either case, shared living arrangements along this continuum do not fall within the ambit of the Lodging House Statute.  They are certainly regulated by zoning, sanitation and building codes, but not by Mass. Gen. L. ch. 140, § 22 et seq.  The Licensing Board cannot extend the reach of the Lodging House Statute beyond its meaning just because the statute is approaching obsolescence.

The Statute certainly still applies to some current housing situations, most notably skid-row-type, single-room occupancies.  ISD's December 26, 2001, Commissioner's Bulletin describes a proposed bill to amend the Lodging House Statute "to provide modern definitions for housing accommodations."  The proposed definition is in two parts.  The first

22

part – "A dwelling containing four or more single room occupancy units that are let on an individual basis, and where the occupant(s) of each single room occupancy unit contract with the landlord separately; pay rent separately; and can be evicted by the landlord separately without affecting the tenancy of the other occupants" – is plainly contemplated by the current statutory language.  Additional legislation is required if the Lodging House Statute is to regulate shared apartments.

On claim 6, therefore, summary judgment is allowed for defendants Licensing Board and ISD.

C.  Whether Plaintiffs' Apartments Are By Definition Lodging Houses

Plaintiffs and the Licensing Board each seek summary judgment on claims 1 and 2, which allege that the apartments at issue do not fall within the statutory definition of lodging house.  On the record before this Court, genuine issues of material fact remain as to whether plaintiffs' apartments were unlicensed lodging houses under the definition of "lodging house" explained above.  The parties dispute the number of people living with the Oanh family, and as to all plaintiffs, it is unclear whether the people who lived with them truly shared the apartments as tenants or were mere lodgers.

Additionally, even if the Licensing Board wrongly determined that the plaintiffs' apartments were unlicensed lodging houses, the link between these determinations and the evictions is contested.  Chanh gave notice to terminate tenancy to two of the three plaintiff families before the Licensing Board took any action in the case, and he included multiple grounds for eviction.  Yet he brought plaintiffs to Housing Court only after the Licensing Board's decision, expressed hesitation about evicting plaintiffs to ISD and later

23

to the Board, and has testified that he sought eviction because the Board and ISD told him to do so.  This competing evidence of causation belongs to the jury.

Therefore, on claims 1 and 2, both plaintiffs' and the Licensing Board's motions for summary judgment are denied.

III.  Whether the Licensing Board and ISD Violated Equal Protection

All three moving parties seek summary judgment on claim 3, which alleges that the Licensing Board and ISD violated equal protection and substantive due process under the federal and state constitutions "[b]y classifying Plaintiffs based on kinship relations to other residents of the premises and subjecting them to eviction because of a lack of a sufficient degree of kinship among the residents . . . ."   Plaintiff's claim has scant legal support. This case does not involve the regulation of a suspect class or the interference with a fundamental right, so rational basis review is warranted under equal protection and due process analysis.  Village of Belle Terre v. Boraas, 416 U.S. 1, 8 (1974).[13]  Some thirty years ago, the Supreme Court upheld an equal protection challenge to a zoning ordinance limiting the occupancy of one-family dwellings to no more than two unrelated people because "[t]he regimes of boarding houses, fraternity houses, and the like present urban problems.  More people occupy a given space; more cars rather continuously pass by; more cars are parked; noise travels with crowds."  Id. at 9.[14]  The rational basis that was dispositive in Boraas extends to the manner in which the agency defendants applied the Lodging House Statute in the present case.

_____

[13] While in rare circumstances the Massachusetts standards for equal protection and due process may be more stringent than their federal counterparts, this case does not present one of those occasions.  See, e.g., Rushworth v. Registrar of Motor Vehicles, 596 N.E.2d 340, 343-44 (Mass. 1992).

[14] Citing Boraas, plaintiffs seem to admit in one of their briefs that defendants' actions met federal standards.

As a facial matter, furthermore, the statutory definition of a lodging house in terms of the familial relationship between the lodgers and the keeper meets the minimal standard for rationality mandated by the case law – namely, that a policy is "not arbitrary." Id. at 8; see also F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 315 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").  In the present case, lodging house regulations protect lodgers from substandard living conditions.  Lodgers – who, as is the case here, often cannot afford other living arrangements – may feel they have little choice but to live with substandard conditions.  Conversely, lodging house keepers may be tempted to under-maintain their properties, given the small profit margins to be gained from a relatively low-cost housing option.  It is entirely rational to think that these incentives – to under-report problems and to under-maintain properties – are less powerful where lodger and keeper are members of the same family.  Keepers would have a reason beyond economics to keep lodgings habitable, and it may be easier for lodgers to approach family members about maintenance problems.  The Lodging House Statute therefore survives plaintiffs' equal protection and due process challenge.  Summary judgment for defendants is allowed on claim 3, and plaintiff's motion for summary judgment is denied.

IV.  Whether the Licensing Board and ISD Violated Plaintiffs' Procedural Due Process Rights

Plaintiffs and the agency defendants also seek summary judgment on claim 4, which alleges procedural due process violations on the part of ISD and the Licensing

Board.  It is undisputed that ISD provided plaintiffs with no notice of its determination that

their living situations violated the Lodging House Statute, nor did ISD notify them of its

formal request that the Licensing Board hold a public hearing and enjoin the use of the

apartments as lodging houses.  The Board, in turn, failed to give plaintiffs any notice of the

March 28, 2000, public hearing and subsequent action.  Plaintiffs argue that these failures

deprived them of property without due process of law.  As explained in section II.C, supra,

genuine issues of material fact remain regarding the causal link between the ISD and

Licensing Board's determinations and the landlord's decision to evict plaintiffs.  That is to

say, it is unclear whether the agencies' failures to give plaintiffs notice and an opportunity

to be heard actually deprived them of property.  Therefore, plaintiffs' motion for summary

judgment is denied.

ISD and the Licensing Board, on the other hand, contend that (1) plaintiffs, as at-will

tenants, had no interest that warranted notice and a hearing; (2) neither agency actually

took any action against plaintiffs;[15] and (3) no additional process is necessary because

plaintiffs were afforded all the process that is due when they received notice and an

opportunity to be heard at their eviction proceedings.  None of these contentions has any

merit.

First, plaintiffs' tenant-at-will status does not deprive them of the right to know that a

government agency is trying to force their eviction.  A tenancy may be terminable at the will

---

[15] In connection with the second point, ISD argues that Chanh served two of the
plaintiff families with notice to terminate "prior to ISD taking legal action against the
Landlord."  In fact, those notices were served 12 days after ISD ordered Chanh to "[a]pply
and secure a permit to change the occupancy . . . to: Lodging House or remove the illegal
unit and restore the building to its legal occupancy."

of either the landlord or tenant, but that does not mean that it is terminable at the will of the government.  In the employment context, the Supreme Court wisely observed that "[t]he fact that employment is at the will of the parties does not make it at the will of others.  The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and . . . the unjustified interference of third persons is actionable although the employment is at will."  Truax v. Raich, 239 U.S. 33, 38 (1915).  The same holds true with plaintiffs' tenancy.  Plaintiffs have a manifest interest in maintaining a home and a landlord-tenant relationship, regardless of the nature of the tenancy.  The government cannot deprive plaintiffs of this interest without affording them due process of law.

Second, genuine issues of material fact exist regarding whether ISD and the Licensing Board took action against plaintiffs.  The day after the February 16, 2000, inspections, ISD made a formal determination that plaintiffs' apartments were illegal lodging houses.  That same day, the agency sent a notice to the landlord ordering him to "secure a permit" for a lodging house or "remove the illegal unit."  As discussed above in the section on standing, the Licensing Board told the landlord at the March 28, 2000, hearing that if he started evicting the plaintiffs, the Board would not "jump down [his] throat." The Board's notice of the action issued after the hearing states that "owner will file eviction notices."  After the hearing, Chanh sued the plaintiffs in Housing Court.  He has testified in deposition that the evictions were compelled by the Board and ISD.  The defendant agencies took action, and if as a result the landlord evicted plaintiffs, then the action was taken against them.

Finally, the fact that plaintiffs had notice and an opportunity to be heard at the eviction proceedings does not relieve the Board and ISD of liability if their actions forced the landlord to evict.  This case does not merely concern whether the plaintiffs are entitled to remain in their apartments; also at issue is the government's ability to compel a landlord to commence eviction proceedings.  By the time a tenant finds himself or herself in Housing Court, the damage has been done.  This is all the more true considering that landlords do not have to give at-will tenants a reason for evicting them.  It is entirely possible that tenants could be evicted without even knowing that their landlords were being forced to do so.

Therefore, ISD and the Licensing Board's motions for summary judgment as to claim 4 are denied.

V.  Whether ISD's Inspections Violated Plaintiffs' Right to Privacy

Finally, plaintiffs and ISD seek summary judgment on claim 5, which alleges that the ISD inspections violated plaintiffs' federal and state privacy rights.  As a preliminary matter, plaintiffs appear to concede that the Massachusetts Civil Rights Act, Mass. Gen. L. ch. 12, § 11I, does not cover actions against a municipality and an employee in his official capacity.  Therefore, ISD's motion is allowed as to those portions of claim 5 alleging violations of the MCRA.

The remainder of claim 5 alleges privacy violations under 42 U.S.C. § 1983, the Massachusetts Declaration of Rights, and the state privacy statute, Mass. Gen. L. ch. 214, § 1B.  Of those three remaining bases, ISD only asks for summary judgment on the section 1983 claim.  First, ISD argues that its commissioner, Kevin Joyce, must be dismissed as a

matter of law because the Complaint is duplicative in naming as defendants both ISD and

Joyce in his official capacity.  Although it is settled law that "official-capacity suits generally

represent only another way of pleading an action against an entity of which an officer is an

agent," Monell v. Department of Soc. Servs., 436 U.S. 658, 690 n.55 (1978), ISD cites no

authority that compels dismissal of the officer when the entity is also named as a

defendant.  Defendant Joyce is therefore not dismissed from the section 1983 claims.

More substantially, ISD contends that plaintiffs have failed to show that their rights

were violated as a result of an unconstitutional policy or practice.  A municipality "cannot be

held liable [under section 1983] unless a municipal policy or custom caused the

constitutional injury."  Leatherman v. Tarrant County Narcotics Intelligence and

Coordination Unit, 407 U.S. 163, 166 (1993).  Plaintiffs allege in their Complaint that "ISD

has a pattern and practice of inspecting and videotaping residential apartments, and

interrogating residents, in a manner violative of residents' protected rights" (¶ 109).  More

specifically, plaintiffs state that they were frightened by the number of people (10) who

showed up at their doors and demanded entry, that consent was coerced and was

requested only after the inspections had already occurred, and that the consent forms were

inadequately translated.  A 1999 ISD commissioner's bulletin, however, mandates that "[i]f

present, the occupant must give inspectors their written consent to allow inspectors to

enter the premise to conduct the inspection.  Before inspectors enter a premise, they must

have the occupant read and sign a Consent For Administrative Inspection form."

Nevertheless, genuine issues of material fact remain.  Commissioner Joyce

created a special team to conduct inspections of potential lodging houses.  When the

inspections of plaintiffs' apartments occurred in early 2000, it is disputed whether it was

ISD's policy to have all inspectors approach the door of a residence at once.  One housing

inspector on the special team, Iris Figueroa, testified that it <u>was</u> ISD policy at the time to

have the whole team approach a residence.  According to her, the policy was "modifi[ed]"

as a result of the inspections of plaintiffs' apartments – so as "not to intimidate anyone,"

now only two inspectors make the initial contact while the rest of the search team stays in a

van. By contrast, Deputy Commissioner Frank Frattaroli, whom Joyce put in charge of the

special lodging house inspection team and who led the inspections at issue in this case,

testified that the "en masse" approach was <u>not</u> ISD's policy. "[H]aving the whole team out

there would be intimidation.  People would be worried," Frattaroli said at his deposition.

Additionally, although ISD contends that it performed inspections in accordance

with its policies, the parties dispute whether consent was obtained before or after the

inspections and whether or not the consent forms were adequately translated.  Even

though ISD's outward policy was to obtain consent prior to entry, genuine issues of

material fact remain as to whether ISD had a policy or custom of intimidating residents and

conducting unauthorized and/or coerced inspections.  Issues of fact also remain as to the

extent of ISD's videotaping.  Therefore, ISD's motion for summary judgment on count 5's

section 1983 claim is denied.

Conclusion

Accordingly, plaintiffs' motion for partial summary judgment is denied as to all

claims.  Defendants' motions for summary judgment are allowed only on claims 3 and 6 as

well as the portion of claim 5 that alleges violations of the MCRA.  Claims 7 and 8 were

voluntarily dismissed.

31

_____          s/ Rya W. Zobel_____
       DATE                                RYA W. ZOBEL
                                    UNITED STATES DISTRICT JUDGE